The defendant was indicted for the murder of a negro slave belonging to himself, by the name of Jim. The evidence was principally the testimony of three step-children of the defendant, the eldest of whom, Mary Jane, was about seventeen years old. She stated that the prisoner came home on the evening of the 20th of July last, from a tax-paying, between sun-set and dark, and after asking a question as to the weather, and receiving an answer, sat down at the door for a minute or two, seemed serious and held his head down. He then got up and went out, and was out for some time; the precise time not stated. She next heard the deceased at the woodpile, crying out, "don't kill me," and the prisoner cursing him, and saying, "he intended to kill him." On going to the door, she saw the prisoner beating the deceased with the handle of an axe, holding the blade in both hands. He beat the deceased, she stated, two or three times around the woodpile, from thence to the barn, and from thence to the house, still using the handle of the axe. This handle, she said, was split before the beating began, for about a finger's length from the end, and that the force used split it further, to within a finger's length of the blade. This handle, she said, was of hickory, and about the usual size. Afterwards, she said, she saw blood on the axe-handle. The deceased then ran into the kitchen, saying to the prisoner, that he would kill him, to which he, prisoner, replied, he intended to do so. The prisoner then putting down the axe at the door, went in, and striking the deceased with his fist on the side of the head, knocked him against the fire-board, from which he fell violently on the floor. From that time, she said, the negro became speechless. She heard him making groans several times in the house and out of it. After the deceased fell, the *Page 251 
prisoner jumped on him, and stamped him for more than ten minutes; that he stamped him upon the head, shoulders, back and sides; indeed, all over; that the prisoner then called for his wagon-whip, and with the butt of it beat the deceased a long time, to wit, for half an hour, upon the head, back and sides; that he would beat until he became exhausted, and then rest and commence again; that he then called for scalding water, and there being none, had water heated, and poured it on the head, back and sides of the deceased; that he then took salt, and putting it on the back of the deceased, whipped it into the flesh with the wagon-whip. She said that he heated water four or five times, and poured it on the deceased; that this stamping, whipping with the wagon-whip, and pouring of the scalding water, continued without cessation until 9 or 10 o'clock at night. He then made the witness and her sister drag the deceased out of the house into the yard, and said, "damn you, you may rest there while I rest in here," and went to bed.
The other two children, Martha, about thirteen years of age, andPinkney, about fifteen, proved in substance the same. It was then proved that the wagon-whip was of a large size, with a butt-end of wood covered with leather.
One of the witnesses stated, that while the prisoner was beating the deceased with the axe-handle near the wood-pile, he said, "why did you not" or "you did not feed my horse," to which the deceased replied, that he had fed the horse. The only other words the deceased was heard to say, were, "Oh Lord!" and "you will kill me." These last words were said at different times, and the prisoner replied, "I intend to kill you." It was in proof, that the deceased died about 1 o'clock the next morning; and about 4 o'clock, the prisoner got up and went into the yard and enquired for his family, who had all fled but Martha; that he made her assist him in dragging the body into his (deceased's) house or cabin; that he told her to shut the door and nail it up from the inside, and that she must come out by raising a plank of the floor; that he made the witness wash up the blood from the kitchen floor, *Page 252 
and put sand on the floor; that there was much blood on the floor before it was washed off.
One Johnson swore that about 10 or 11 o'clock, the wife of the deceased came to his house, and he returned with her; that the deceased was then lying in the yard, still alive, but breathing very hard and making a gurgling noise in breathing. This witness also proved that Jim was the slave of the deceased, and was about sixty years old.
The coroner of the county, and one of the jury of inquest, testified that they went to the house of the prisoner on the evening of the 21st of July last, about one hour before sunset, and found the deceased in his cabin on a sort of bed or scaffold, dead; that they then took the deceased into the yard, and examined the body; that his jaw-bone was broken, and his teeth knocked out; and that there appeared on the head, seven wounds, six on the front and one on the back part of the head; that one of those in front was of a dangerous character; the other five very severe; there was one of the wounds on each temple, and the other four between these, on the forehead; that the wound on the back of the head was a round indentation, and witnesses thought the skull was "dented" or fractured; that they did not particularly examine the other parts of the body, and only saw one place on the breast and one on the back where there was any abrasion of the skin. The coroner stated that the head of the deceased was very much mutilated, and on that account he did not particularly examine the body. A physician, Doctor Cook, who heard all the evidence, stated it as his opinion, that the deceased died from the violence inflicted; and that the wounds on the front part of the head, as described by the coroner, were of a character to produce death.
The defendant introduced no testimony.
1. The Court charged the jury, that a master has a right to chastise his slave, and to exercise his own discretion as to the amount of punishment, provided life is not taken, and that the Court had no right to question his authority so to do; that if the master take life, he is then held responsible. *Page 253 
2. If the master chastise his slave for the purpose of correction and amendment, and unfortunately kill him, without any intention of so doing, and without a weapon calculated to kill, he is not guilty of any offense.
3. If the slave be disobedient, or if he resist the authority of his master, and under passion excited by this provocation, be slain by the master, the offense would not be murder, but manslaughter only; although a deadly weapon was used. The disobedience, or resistance, would amount to a legal provocation, and would be the same as a blow from a white man.
4. If the master intend to kill, it is immaterial how death be produced, whether with or without a deadly weapon, and death ensue, he is guilty of murder.
5. If he do not intend to kill, but deliberately chastises for the mere purpose of torture and revenge, and death ensue, he is guilty of murder. If he do not intend to kill, but uses a deadly weapon for the mere purpose of inflicting great bodily harm, regardless whether death might follow or not, and death does follow, it is murder.
6. If the master strike with his fist, not intending to kill, but strikes to correct and amend, and a mortal blow be received by the slave's falling against the fire-board, or upon the floor, it is no offense, and is an accidental killing.
7. If, however, after such a blow be given with the fist, and a mortal blow is received by the fall, the master beat him while on the floor, with the butt-end of a wagon-whip, out of mere cruelty, torture and revenge, and not for correction, and his death be thereby hastened; or in other words, although he would have died of the mortal wound received by the fall, but would not have died so soon, according to the opinion of the doctor, and these additional blows be given merely for the purpose of torture and of malice, he would be guilty of murder.
8. The Court further charged the jury, that the axe-helve with which the prisoner struck the deceased, was a deadly weapon; and whether the wagon-whip was a deadly weapon or not, was a question for them and not for the Court. *Page 254 
9. The Court further charged, by way of application of the principles above declared, that if the jury should be satisfied that the first three witnesses had told the truth, and that Jim had not fed his master's horse, the master had a right to inflict punishment, and as to the amount of punishment he was the sole judge, and it was the duty of the deceased to submit; that he had no right to run; that running would be disobedience, unless his life would be put in jeopardy by submission; that if the prisoner were about to take the life of the deceased, then he had a right to run, otherwise he must unfeignedly submit to the will of his master.
10. That if the doctor were correct in his opinion, that the mortal blow was received in the house, and it was caused, as before stated, by falling; and after the mortal blow was received, the prisoner beat with the whip, stamped with his feet, and used the hot water and salt for a length of time and in the manner stated by the first three witnesses, and this beating and stamping shortened the life of the deceased for only one hour, if done out of malice and for the purpose of torture, he would be guilty of murder.
The prisoner's counsel asked the Court to charge the jury, that if a master is seen whipping his slave, the presumption is that he is rightfully whipping him.
The Court declined to charge the jury in the language thus used, but charged them, as before stated, that the master had a right to inflict punishment without provocation; and if he did not kill, his acts could not be questioned in a Court of justice.
The Court further charged, that the presumption was that the prisoner was innocent until the contrary was proved, and that if a killing were proved, or admitted, the presumption was that it was murder, unless the contrary was either shown by the prisoner or it appeared from the evidence adduced by the State.
The Solicitor for the State moved his Honor to charge, that if the first three witnesses were believed by the jury, the prisoner was guilty of murder.
The prisoner's counsel admitted that the prisoner had caused *Page 255 
the death of the deceased, but insisted that it was only manslaughter. Defendant excepted on the ground of the Court's refusing the instruction asked, and for error in the charge, particularly in 4, 5, 7 and 10 of the foregoing propositions.
Verdict — "guilty of murder." Judgment and appeal.
Upon the testimony, supposing it to be true, the counsel admitted on the trial, that the deceased was killed by the prisoner; but contended that it was not a case of murder, but of manslaughter only. The jury, under the charge of the presiding Judge, having found him guilty of murder, his counsel excepts to the charge as erroneous in several particulars, and insists that he is, therefore, entitled to a venire de novo.
In considering those exceptions, it is proper to remark, that "the language of a Judge in his charge to the jury, is to be read with reference to the evidence, and the points disputed on the trial; and of course is to be construed with the context." State v. Tilley, 3 Ire. 424. It is also to be borne in mind, that counsel have no right to require an instruction upon a hypothetical state of facts, not supported by the testimony; and if the Judge express an opinion "upon a mere abstract proposition, and it is apparent upon the whole case, that it could not have misled the jury," it is not erroneous. State v. Benton, 2 Dev. and Bat. Rep. 196; State v.Collins, 8 Ire. Rep. 407; Hice v. Woodard, 12 Ire. Rep. 293. The Judge commenced his charge in the present case, by stating a series of propositions, among which are those to which the prisoner excepts. Without noticing any others than those which the counsel deem objectionable, we are of opinion that they were merely abstract, having no connection with any state of facts proved on the trial. This very clearly appears from the application which the Judge himself made of the "principles" which he had before declared. In such application, *Page 256 
he stated the law as favorable to the prisoner as the latter had any right to require; and in so doing, corrected whatever error he may have previously committed. It is unnecessary to comment upon the facts in detail. The homicide being admitted, we may say, as this Court said inState v. Hoover, 4 Dev. and Bat. Rep. 365, that we are "at a loss to comprehend how it could have been submitted to the jury, that they might find an extenuation from provocation. There is no opening for such a hypothesis." The only act of the deceased, that can be held to have been a provocation, was the imputed neglect to feed his master's horse. His flight, while his master was beating him with a deadly weapon, and declaring that he intended to kill him, cannot be deemed such. State v.Will, 1 Dev. and Bat. Rep. at p. 165. The prisoner then had a right to chastise the deceased for the only offense of which there is the slightest testimony that he was guilty. Can the prisoner take shelter under that right, for what he actually did? We adopt for our answer, with a slight variation, other language of the Court, in the same case of the State v.Hoover, "that nothing could palliate such a course of conduct. Punishment, thus immoderate and unreasonable in the measure, the continuance, and the instruments, loses all character of correction in foro domestico, and denotes plainly, that the prisoner must have contemplated the fatal termination which was the natural consequence of such barbarous cruelties."
Our conclusion then is, that there is no view which could have been taken by the jury, of the facts set out in the prisoner's bill of exceptions, that would mitigate the admitted homicide from murder to manslaughter. The consequence is, that the judgment cannot be reversed; and there being no error assigned or seen for its arrest, a certificate to that effect must be sent to the Superior Court, to the end that the sentence of the law may be pronounced upon the prisoner.
PER CURIAM. Judgment affirmed. *Page 257